.
UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

              Plaintiff,          Civil No. 13-5755 (NLH/JS)

v.                         **FINAL ORDER OF DEFAULT**
                                **JUDGMENT AS TO DEFENDANTS**
MICHAEL J. SIEGEL, et al.,    **MICHAEL J. SIEGEL, TOTE**
                                **FUND LLC AND MJS CAPITAL**
             Defendants.      **MANAGEMENT LLC**

_____

**HILLMAN, District Judge**

     On September 27, 2013, the Commodity Futures Trading
Commission (hereafter, "Commission") filed a complaint against
Defendants Michael J. Siegel, TOTE Fund LLC (hereafter, "TOTE")
and MJS Capital Management LLC (hereafter, "MJS") seeking
injunctive and other equitable relief, as well as the imposition
of restitution and civil monetary penalties, for violations of
the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. §§ 1 et
seq. (2002), and the Commission's Regulations promulgated
thereunder, 17 C.F.R. § 1 et seq. (2004).

     Defendants failed to respond to the complaint, and the
Commission thus requested a Clerk's entry of default on January
31, 2014.  Thereafter, Defendants having failed to seek to
vacate the entry of default, the Commission filed the present

motion for default judgment.  The Court, having carefully considered the complaint, the allegations of which are well-pleaded and hereby taken as true, the Commission's motion for entry of default judgment, and the Declaration of Kara L. Mucha, Futures Trading Investigator for the Commission (hereafter, "Mucha Decl."), finds that there is good cause for the entry of this Final Order of Default Judgment as to Defendants Siegel, TOTE, and MJS and that there is no just reason for delay.

Therefore, on this  30th  day of December, 2014, the Court:

**GRANTS** the Commission's motion [Doc. No. 11] for judgment of default as to Defendants Siegel, TOTE and MJS;

**ORDERS** the entry of the Findings of Fact and Conclusions of Law set forth below; and

**GRANTS** the Commission's requests for relief, as set forth below.

I.   **FINDINGS OF FACT**

The Court hereby finds as follows:

A.   **The Parties**

1.   The Commission is an independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Act and the Regulations promulgated under it.  (Compl. ¶ 12.)

2.   Defendant TOTE was a Delaware limited liability company with its principal place of business in Los Angeles,

2

California.  TOTE served as the commodity pool operator
(hereafter, "CPO") for a commodity pool, the Monarch Futures
Fund LLC (hereafter, "Monarch"), from August 2007 through at
least October 2010.  TOTE acted as the manager of Monarch.  (Id.
¶¶ 13, 16, 18.)

4.     3.     Defendant MJS was a Delaware limited liability
company with its principal place of business in Los Angeles,
California.  MJS served as the CPO for a commodity pool, the QEP
Futures Fund LLC (hereafter, "QEP"), from August 2008 through at
least October 2010.  MJS acted as the manager of QEP.  (Id. ¶¶
14, 16, 20.)

4.     Defendant Siegel is an individual who resides in
Northfield, New Jersey.  Siegel is the chief executive officer
and sole principal of both TOTE and MJS, and was responsible for
the day-to-day operations of TOTE and MJS.  Siegel controlled
the operations of TOTE including controlling its bank accounts,
and distributing all promotional materials.  (Id. ¶ 15.)

**B.    Siegel's Formation and Operation of the Monarch and
       QEP Pools**

5.     In August 2007, Siegel formed Monarch as a
vehicle for trading futures contracts using an automated trading
system he developed called MX2.  In August 2008, Siegel formed
QEP for the same purpose. (Id. ¶ 16.)

3

6.   Siegel solicited pool participants for Monarch and QEP from among students and family members of students he taught to trade using his MX2 trading program, which computerized Siegel's trading philosophy.  (Id. ¶ 17.)

7.   Approximately ten individuals and one entity placed funds totaling $400,000 with Monarch.  (Id. ¶ 19.)

8.   TOTE filed a Notice of Claim Exemption from Commodity Pool Operator registration pursuant to Commission Regulation 4.13(a)(2), 17 C.F.R. § 4.13(a)(2) (2007), with reference to Monarch, which is listed as a commodity pool operated by TOTE.  (Id. ¶ 18; see also Mucha Decl., Ex. A.)

9.   Three individuals placed funds totaling approximately $975,000 with QEP.  (Compl. ¶ 21.)

10.  MJS filed a Notice of Claim Exemption from Commodity Pool Operator registration pursuant to Commission Regulation 4.13(a)(4), 17 C.F.R. § 4.13(a)(4) (2007), with reference to QEP, which is listed as a commodity pool operated by MJS.  (Id. ¶ 20; see also Mucha Decl., Ex. B.)

11.  Defendants used the mails or other instrumentalities of interstate commerce by, inter alia, using the United States Postal Service or other private or commercial interstate carriers to send payments to pool participants and wiring funds to and from pool accounts to Siegel's personal bank accounts.  (Compl. ¶ 49.)

4

**C.    Siegel's Misappropriation of Monarch and QEP Pool Participant Funds**

12.   TOTE and MJS were each to receive an incentive fee of thirty-five percent (35%) of all net new trading profits each month, plus 0.2 percent of the net asset values of the pools as a monthly management fee and approximately two percent (2%) of the net asset value of the pools annually as administrative fees or operating expenses.  (Compl. ¶ 23.)

13.   Although Siegel's trading generated some profits in 2008, overall trading for both pools was unprofitable in 2009.  (Id. ¶ 24.)

14.   Because there were no profits for either pool in 2009, no incentive fees were due to Defendants.  (Id. ¶ 25.)

15.   From approximately January 2008 through October 2010, Siegel transferred from Monarch and TOTE to his personal bank accounts and a credit card account approximately $105,186 more than he and TOTE were purportedly due in incentive and other fees.  (Id. ¶ 26.)

16.   In September 2008, Siegel withdrew approximately $36,000 from QEP to pay non-pool expenses.  In addition, from September 2008 through October 2010, Siegel transferred from QEP and MJS to his personal bank account and a credit card account approximately $50,503 more than he and MJS were due in incentive and other fees.  Thus, in total, Siegel transferred from the QEP

bank accounts and related account approximately $86,503 more than he was purportedly due in incentive and other fees to his personal bank accounts, a credit card account, and for the purpose of paying non-pool expenses.  (Id. ¶ 27.)

17.  Siegel transferred approximately $511,598 from bank accounts in the names of Monarch, QEP, and TOTE to his personal bank accounts, to a credit card account and to at least one individual.  Siegel used some of these funds to pay personal expenses.  (Id. ¶ 28.)

18.  From September 2008 through October 2010, Siegel earned $319,909 in incentive, management and administrative fees based on his trading for Monarch and QEP.  (Id.)

19.  From August 2007 through October 2010, Defendants withdrew in total approximately $191,689 from Monarch and QEP for non-pool expenses and fees to which Defendants were not entitled.  (Id.)

20.  Siegel testified that he did not keep track of the incentive fees, and that he "was just drawing against the fees that [he] felt . . . were being earned and [he] assumed that the records and the brokerage office and the records at the bank ultimately would . . . balance out."  (Mucha Decl., Ex. E at 88:8-14.)  He further testified that his principle in determining the amount of incentive fees was "arbitrary," that he took whatever amount of money he felt he needed to pay

personal expenses and living expenses, and that he would thereafter calculate what amount of funds should have been withdrawn.  (Id. at 89:2-14.)

21.  Defendants Siegel and MJS failed to return funds to at least two pool participants who sought to withdraw their funds from QEP at or near the end of 2009.  (Compl. ¶ 29.) Specifically, two QEP pool participants, Carl Coffman and Robert Lund, sought to withdraw their funds from QEP at or near the end of 2009.  (Mucha Decl. ¶ 46.)  Siegel and MJS failed to return approximately $71,998.60 to Coffman and approximately $32,685.87 to Lund.  (Id.)

**D.  Defendant TOTE Failed to Provide Copies of Monthly Futures Commission Merchants Statements to the Monarch Pool Participants**

22.  From August 2007 through October 2010, TOTE, acting through Siegel, failed to provide pool participants with copies of the monthly statements received by TOTE from the futures commission merchants (hereafter, "FCM") who carried Monarch's trading accounts.  (Compl. ¶ 30.)

23.  Instead of providing monthly statements from the FCM, TOTE, acting through Siegel, provided only a few quarterly updates generally describing the status of Monarch's trading and sometimes included only a page or two of the statements received from the FCM.  (Id. ¶ 32.)

7

### E.   Siegel Controlled TOTE and MJS and was their Agent

24.   From August 2007 through October 2010, Siegel was a controlling person of TOTE and MJS.  Siegel acted as the Chief Executive Officer and sole principal of both TOTE and MJS. Siegel was the sole person responsible for directing trades on behalf of TOTE and MJS and for the day-to-day operations of TOTE and MJS.  (Id. ¶ 33.)

### F.   Recent Trading Communications

25.   Since the filing of the complaint in this matter, the Commission has received inquiries from some individuals who had prior dealings with Siegel concerning his trading system or his mentoring.  These individuals informed Commission staff that Siegel contact them recently to discuss participation in trading activity.  (Mucha Decl. ¶ 49.)

## II.   CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue

1.   This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to bring an action in the United States district court for injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

8

2.    Venue properly lies with the Court pursuant to Section 6c(3) of the Act, 7 U.S.C. § 13a-1, in that the Defendants are found in, inhabit, reside and/or transact business in the District of New Jersey.

**B.    Standard for Default Judgment**

3.    The first step in obtaining a default judgment is the entry of default.  "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the Clerk must enter the party's default."  Fed. R. Civ. P. 55(a).

4.    The Clerk properly entered default against Defendants.  Pursuant to Federal Rule of Civil Procedure 4(e)(1), service of process may be effected on an individual by "delivering a copy of the summons and of the complaint to the individual personally[.]"  Fed. R. Civ. P. 4(e)(1).  Service of process as to corporate defendants is proper if made, as was done in this case, on a corporation's officer "by delivering a copy of the summons and of the complaint to an officer[.]"  Fed. R. Civ. P. 4(h)(1).  Here, Defendant Siegel was served with the summons and complaint directed to him, individually, and as an officer of Defendants TOTE and MJS, on October 20, 2013.  (Decl. of James A. Garcia ¶ 4.)  Pursuant to Federal Rule of Civil Procedure 12(a)(1), Defendants were required to respond to the Commission's complaint within twenty-one days from the date of

service.  Although service of process was properly effected, Defendants failed to timely respond to the complaint and have otherwise failed to appear in this action.[1]  Accordingly, the Commission requested entry of default on January 31, 2014 and the Clerk properly entered default on February 3, 2014.

5.  "Federal Rule of Civil Procedure 55(b)(2) authorizes courts to enter a default judgment against a properly served defendant who fails to a file a timely responsive pleading." Chanel v. Gordashevsky, 558 F. Supp. 2d 532, 535 (D.N.J. 2008) (citing Anchorage Assoc. v. Virgin Is. Bd. of Tax Rev., 922 F.2d 168, 177 n.9 (3d Cir. 1990)).  However, a party seeking default judgment "is not entitled to a default judgment as of a right." Franklin v. Nat'l Maritime Union of America, 1991 U.S. Dist. LEXIS 9819, at *3-4 (D.N.J. 1991) (quoting 10 Wright, Miller & Kane, Federal Practice and Procedure § 2685 (1983)), aff'd, 972 F.2d 1331 (3d Cir. 1992).  The decision to

---

[1] The Court notes the Declaration of James A. Garcia, which indicates that counsel for the Commission was contacted by an attorney, Jack A. Berenato, Esq., on behalf of Defendant Siegel on November 26, 2013.  (Decl. of James A. Garcia (hereafter, "Garcia Decl.") ¶ 7.)   The Commission's counsel represents that multiple attempts to reach Mr. Berenato were made between November 27, 2013 and January 27, 2014 to ascertain when he intended to appear on behalf of Defendants and file answers to the complaint.  (Id. ¶ 8.)  Mr. Berenato purportedly contacted counsel for the Commission on February 7, 2014 and advised that he intended to seek to vacate the Clerk's entries of default. (Id. ¶ 11.)  At this time, none of the defendants has filed a motion to vacate the entry of default.

enter a default judgment is "left primarily to the discretion of the district court." Hritz v. Woma Corp., 732 F.2d 1178, 1180 (3d Cir. 1984).[2]

6.   Although every "well-pled allegation" of the complaint, except those relating to damages, are deemed admitted, Comdyne I. Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990), before entering a default judgment the Court must decide whether "the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law," Chanel, 558 F. Supp. 2d at 535 (citing Directv, Inc. v. Asher, No. 03-1969, 2006 WL 680533, at *1 (D.N.J. Mar. 14, 2006)).

7.   "Three factors control whether a default judgment should be granted: (1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." Chamberlain v. Giampapa, 210 F.3d 154, 164 (3d Cir. 2000); United States v. $55,518.05 in U.S. Currency, 728 F.2d

---

[2] Rule 55(b) of the Federal Rules of Civil Procedure provides that notice of the motion for default judgment must be sent when "the party against whom a default judgment is sought has appeared personally or by a representative," and written notice of the application must be sent at least seven days before the hearing.  Here, none of the defendants has appeared personally or through a representative.  Nonetheless, counsel for the Commission represented that he would send copies of this application to Mr. Berenato and Defendant Siegel so as to provide notice of the motion.  (Garcia Decl. ¶ 16.)

192, 195 (3d Cir. 1984).  If a review of the complaint
demonstrates a valid cause of action, the Court must then
determine whether plaintiff is entitled to default judgment.

    **C.**   **Defendants Violated Section 4b(a)(2)(i) and (iii) of the Act for conduct prior to June 18, 2008 and Section 4b(a)(1)(A) and (C) of the Act for conduct on or after June 18, 2008[3]**

    8.  With respect to conduct occurring before June 18,
2008, Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §
6b(a)(2)(i) and (iii), makes it unlawful:

> for any person, in or in connection with any
> order to make, or the making of, any
> contract of sale of any commodity for future
> delivery made, or to be made, for or on
> behalf of any other person if such contract
> for future delivery is or may be used for
> (A) hedging any transaction in interstate
> commerce in such commodity or the products
> or byproducts thereof, or (B) determining
> the price basis of any transaction in
> interstate commerce in such commodity, or
> (C) delivering any such commodity sold,
> shipped, or received in interstate commerce
> for the fulfillment thereof--
>
> > (i) to cheat or defraud or attempt to
> > cheat or defraud such other person;
> > [or]
> >
> >    . . .
> >
> > (iii) willfully to deceive or attempt
> > to deceive such other person by
> > any means whatsoever in regard to

---

[3] Portions of the Act were amended in 2008.  Defendants' alleged acts occurred between 2007 and 2010, making both versions of the Act applicable to this case.  The amendments to the relevant section are not so substantive as to warrant separate discussion.

any such order or contract or the
disposition or execution of any
such order or contract, or in
regard to any act of agency
performed with respect to such
order or contract for such
person[.]

9.   With respect to conduct occurring on or after
June 18, 2008, Section 4b(a)(1)(A) and (C) of the Act, 7 U.S.C.
§ 6b(a)(1)(A) and (C), make it unlawful

(1) for any person, in or in connection with
any order to make, or the making of, any
contract of sale of any commodity in
interstate commerce or for future delivery
that is made, or to be made, on or subject
to the rules of a designated contract
market, for or on behalf of any other person
. . . (A) to cheat or defraud or attempt to
cheat or defraud the other person; [or] . .
. (C) willfully to deceive or attempt to
deceive the other person by any means
whatsoever in regard to any order or
contract or the disposition or execution of
any order or contract, or in regard to any
act of agency performed, with respect to any
order or contract for or, in the case of
paragraph (2), with the other person[.]

10.   Courts have held that misappropriation of pool
participant funds, knowingly or with reckless disregard for the
truth, constitutes a violation of Section 4b(a)(2)(i) and (iii)
of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii), with respect to
acts occurring before June 18, 2008, and Section 4b(a)(1)(A) and
(C) of the Act, 7 U.S.C. § 6b(a)(1)(A) and (C) with respect to
acts occurring on or after June 18, 2008. See, e.g., Commodity
Futures Trading Comm'n v. U.S. Ventures LC, No. 2:11CV00099,

13

2014 WL 3889068, at *6-7 (D. Utah June 6, 2014); Commodity Futures Trading Comm'n v. Varlesi, Civ. A. No. 12-cv-01658, 2013 WL 3771407, at *5 (N.D. Ill. June 12, 2013); Commodity Futures Trading Comm'n v. Palmer, Civ. A. No. CV-09-76-S-EJL, 2012 WL 6930320, at *5 (D. Id. Nov. 30, 2012).

11.   The facts alleged by the Commission establish that from January 2008 through at least October 2010, Defendants Siegel and TOTE, by and through Siegel, cheated, defrauded, attempted to cheat or defraud, willfully deceived and/or attempted to deceive customers of Monarch by misappropriating customer funds knowingly or with reckless disregard for the truth.

12.   The facts alleged by the Commission establish that from September 2008 through October 2010, Defendants Siegel and MJS, by and through Siegel, cheated, defrauded, attempted to cheat or defraud, willfully deceived and/or attempted to deceive customers of QEP by misappropriating customer funds knowingly or with reckless disregard for the truth.

13.   By this conduct, Siegel, MJS and TOTE, by and through Siegel, violated Section 4(b)(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(2)(i) and (iii), with respect to conduct occurring before June 18, 2008, and violated Section 4b(a)(1)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(1)(A) and (C) with respect to conduct occurring on or after June 18, 2008.

14.   The foregoing acts of Siegel were committed within the scope of his employment, office or agency with TOTE and MJS. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), TOTE and MJS are liable for these acts.

15.   Siegel controlled TOTE and MJS, directly or indirectly, and knowingly induced, directly or indirectly, the acts of TOTE and MJS by transferring more funds than were due to Siegel, TOTE or MJS to Siegel's personal bank account and a credit card account.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Siegel is liable for TOTE's and MJS' violations of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(2)(i) and (iii) with respect to conduct occurring before June 18, 2008 and Section 4b(1)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(1)(A) and (C) with respect to conduct occurring on or after June 18, 2008.

**D.   Fraud by a CPO and an AP of a CPO**

16.   Section 4o(1) of the Act, 7 U.S.C. § 6o(1) makes it unlawful for a commodity pool operator or associated person (hereafter, "AP") of a commodity pool operator, to "employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant," or "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

15

17.  A "commodity pool operator" is any person
"engaged in a business that is of the nature of a commodity
pool, investment trust, syndicate, or similar form of
enterprise, and who, in connection therewith, solicits, accepts,
or receives from others, funds, securities, or property, either
directly or through capital contributions, the sale of stock or
other forms of securities, or otherwise, for the purpose of
trading in commodity interests, including any . . . commodity
for future delivery, security futures product, or swap . . .
[.]"  7 U.S.C. § 1a(11).

18.  From August 2007 through October 2010, Defendants
TOTE and MJS acted as commodity pool operators of the Monarch
and QEP pool by engaging in a business that is of the nature of
an investment trust, syndicate, or similar form of enterprise
and by soliciting, accepting or receiving funds from others for
the purpose of trading in futures.  In fact, TOTE and MJS
registered as CPOs exempt from CPO registration pursuant to
Commission Regulation 4.13(a).

19.  An "associated person" is "any natural person who
is associated in any of the following capacities with . . . [a]
commodity pool operator as a partner, officer, employee,
consultant, or agent (or any natural person occupying a similar
status or performing similar functions), in any capacity which
involves (i) the solicitation of funds, securities, or property

16

for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]"  17 C.F.R. § 1.3(aa)(3).

20.  As chief executive officer and sole principal of TOTE and MJS, who solicited pool participants and funds therefrom, Siegel acted as an associated person (hereafter, "AP") of both commodity pool operators.

21.  Defendants TOTE and MJS, as commodity pool operators, and Defendant Siegel as an associated person of a commodity pool operator, violated Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1), in that they employed a device, scheme or artifice to defraud pool participants and/or engaged in transactions, practices or a course of business which operated as a fraud or deceit upon pool participants.  These fraudulent acts include misappropriating funds invested by pool participants.

22.  The misappropriation of pool participant funds was made through use of the mails or other instrumentalities of interstate commerce, including wiring funds to and from pool accounts to Siegel's personal bank accounts, in violation of Section 4o(1)(A) and (B) of the Act.

23.  Defendants engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

24.   Siegel controlled TOTE and MJS, directly or indirectly, and knowingly induced, directly or indirectly, the acts of TOTE and MJS constituting the violations described above.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Siegel is liable for TOTE's and MJS' violations of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B).

25.   The foregoing acts of Siegel occurred within the scope of his employment, office or agency with TOTE and MJS.  Therefore, TOTE and MJS are liable for Siegel's violations of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

**E.   Violation of Commission Regulation 4.13(c)(2)(i)**

26.   Commission Regulation 4.13(c)(2)(i), 17 C.F.R. § 4.13(c)(2)(i), requires that CPOs claiming exemption for registration under Regulation 4.13(a)(2) must promptly furnish to all pool participants a copy of each monthly statement for the pool that the CPO receives from the FCM.

27.   As found above, between August 2007 and October 2010, TOTE, acting through Siegel, failed to provide pool participants with copies of the statements received by TOTE from the FCM who carried Monarch's trading accounts as required under Commission Regulation 4.13(c)(2)(i), 17 C.F.R. § 4.13(c)(2)(i).

18

Instead, TOTE, acting through Siegel, provided only a few quarterly updates.

28.   Siegel controlled TOTE, directly and indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the conduct of TOTE described above.  Therefore, pursuant to section 13(b) of the Act, 7 U.S.C. § 13c(b), Siegel is liable for TOTE's violations of Commission Regulation 4.13(c)(2)(i), 17 C.F.R. § 4.13(c)(2)(i).

29.   The foregoing acts of Siegel occurred within the scope of his employment, office or agency with TOTE.  Therefore, TOTE is liable for Siegel's acts pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

## F.   Defendants' Failure to Answer Warrants Entry of Default Judgment

30.   All three factors that the Court must consider in deciding whether to enter default judgment support entry of default judgment against Defendants.

31.   As to the first factor, whether the party subject to default judgment has a meritorious defense, because Defendants failed to file responsive pleadings it is difficult to ascertain any defenses that might be available.  The Court has considered the well-pleaded allegations in the Commission's complaint, which must be accepted as true, and the Mucha Declaration and attachments thereto, and there is nothing in

19

these documents to suggest that the Commission would not prevail if this action were to proceed.  See UFCW Local 152 Health & Welfare Fund v. Holiday Shop N Bag at Welsh Road, No. 12-7305, 2013 WL 3441290, at *3 (D.N.J. July 9, 2013)("Absent Defendants' responsive pleadings, however, the Court is unable to readily ascertain any meritorious defenses that would be available to Defendants at this time.").

32.  As to the second factor, prejudice to the party seeking default judgment, it is evident to the Court that the Commission will not be able to vindicate the public interest and recover funds misappropriated by Defendants.  The Commission seeks through this action, inter alia, injunctive relief so as to ensure that Defendants do not continue to defraud members of the public, as well as restitution and disgorgement of funds misappropriated by Defendants.  Despite being properly served and having ample opportunity to respond to the complaint, Defendants have not participated in this action and have thereby stalled the Commission's efforts to address Defendants' alleged wrongdoing and recover funds that were purportedly misappropriated by Defendants.  Under these circumstances, absent a default judgment, the Commission will continue to be unable to obtain the relief it seeks from Defendants, and members of the public are at risk of being further defrauded by

Defendants.  Accordingly, the second factor weighs in favor of
entry of default judgment.

33.  Finally, under the third factor, which requires
the Court to consider Defendants' culpability, the record
demonstrates that Defendants, through Defendant Siegel, were
each properly served and had notice that a lawsuit had been
filed against them.  Defendants filed no answer or other
responsive pleading and have made no efforts to obtain an
extension of time to respond to the complaint.  Defendants were
given ample time and opportunity to respond, and counsel for the
Commission attempted without success on several occasions to
contact counsel for Defendant Siegel to assess whether
Defendants intended to participate in this matter.  Nonetheless,
Defendants have not taken any action to respond to the complaint
or otherwise defend against the claims brought by the
Commission.  Thus, the Court finds no excuse or reason for
Defendants' default other than their own conduct.  The third
factor therefore also weighs in favor of entry of a default
judgment.

**G.  Relief Requested**

34.  The allegations in the Commission's pleadings,
taken as true, are sufficient to show that the Commission is
entitled to the requested relief.  Accordingly, having
considered all of the relevant factors, the Court concludes that

the relief sought by the Commission in the complaint is appropriate.

35.   Under Section 6(c) of the Act, 7 U.S.C. § 13a-1(a), injunctive relief is appropriate where there is a reasonable likelihood of future violations.  "In reviewing the grant of an injunction, 'the ultimate test . . . is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'"  Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp., 531 F.3d 1339, 1346 (11th Cir. 2008); Commodity Futures Trading Comm'n v. Am. Metals Exchange Corp., 991 F.2d 71, 73 n.3 (3d Cir. 1993) ("injunctive relief may issue upon a showing that the defendants 'engaged in, [are] engaging in, or [are] about to engage in any act or practice constituting a violation of any provision of the Act.'  The plaintiff also needed to show that the defendants were still in business so that there was a likelihood that violations would continue.").

36.   The Court concludes that permanent injunctive relief is warranted since it is probable that Defendants will engage in future violations of the Act.  In this case, Defendants engaged in egregiously fraudulent conduct in violation of the Act and misappropriated nearly $200,000 for Siegel's personal expenses.  Siegel testified that he siphoned funds arbitrarily, without regard to the amount of fees actually

due to him, and according to the Mucha Declaration has contacted individuals subsequent to the filing of this action to discuss participation in trading activity.  Considering the totality of the circumstances, it appears likely that Siegel, individually or through TOTE or MJS, may engage in future violations of the Act if not permanently enjoined.  Accordingly, the Court will enjoin Defendants from future violations of the Act as well as trading on behalf of any other person or entity, including, but not limited to, any association, partnership, corporation or trust.

        37.  The Court further concludes that restitution is appropriate with respect to Defendants Siegel and MJS so as to make whole the two QEP pool participants, Messrs. Coffman and Lund, who sought to withdraw their funds from QEP near the end of 2009.  "'Restitution is meant to make the damaged persons whole and compensate them for a defendant's wrongful acts.'" Commodity Futures Trading Comm'n v. Perkins, Civ. No. 06-4674, 2009 WL 806576, at *10 (D.N.J. Mar. 25, 2009) (quoting Commodity Futures Trading Comm'n v. AVCO Fin., 28 F. Supp. 2d 104, 121 (S.D.N.Y. 1998)).  Siegel and MJS failed to return approximately $71,998.60 to Coffman and $32,685.87 to Lund for a total of $104,684.47.

        38.  The Court also finds that disgorgement of gains is an appropriate remedy under the circumstances.  "'The

disgorgement remedy is not intended to compensate investors; rather, it is intended to deprive the violator of his ill-gotten gains and to further the deterrence objectives of the [Act].'" Perkins, 2009 WL 806576, at *11 (quoting AVCO, 28 F. Supp. 2d at 121).  Defendants misappropriated $191,689.25 from Monarch and QEP pool participants by withdrawing money from the pools for non-pool expenses and fees to which Defendants were not entitled.  These ill-gotten gains should be disgorged.

39.  The Commission also seeks in its motion for default judgment an assessment of civil monetary penalties at three times the amount of Defendants' gain.  Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d), provides that the Court may assess civil monetary penalties of "not more than the greater of $100,000 or triple the monetary gain to the person for each violation."[4]  The Court notes that civil monetary penalties "act to vindicate" the provisions of the Act and the Commission's rules and "are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that

---

[4] The Commission Regulations set forth inflation-adjusted civil monetary penalties, which state that the penalty for violations committed between October 23, 2004 and October 22, 2008 are "not more than the greater of $130,000 or triple the monetary gain to such person for each such violation," and the penalty for violations committed after October 23, 2008 are "not more than the greater of $140,000 or triple the monetary gain to such person for each such violation."  17 C.F.R. § 143.8(a)(1)(ii)(C)-(D).

noncompliance carries a cost. To effect this exemplary purpose, that cost must not be too low or potential violators may be encouraged to engage in illegal conduct." In re GNP Commodities, Inc. [1990-92 Transfer Binder] Com. Fut. L. Rep. (CCH) ¶ 25,360 at 39,222 (CFTC Aug. 11, 1992).

40. This case warrants the imposition of a civil monetary penalty against Defendants because they knowingly engaged in fraud, which is a core violation of the Act. See Commodity Futures Trading Comm'n v. Arrington, 998 F. Supp. 2d 847, 875-76 (D. Neb. 2014) (citation omitted). Defendant Siegel even contacted individuals after this case was filed to discuss participation in trading activity, and it is not clear that Defendant Siegel, individually or through TOTE or MJS, will comply with the Act in the future unless deterred by civil monetary penalties. Accordingly, the Court will award civil monetary penalties.

41. The Court notes the Commission's allegation in the complaint that "[e]ach act of misappropriation . . . is alleged as a separate and distinct violation" of the Act. (Compl. ¶ 41.) Pursuant to the Act, the Court could award $130,000 or $140,000 (depending on the date of the violation) or treble damages for each violation. Although the complaint does not delineate each separate withdrawal from pool funds for improper purposes, it appears from the Mucha Declaration that

25

there were several separate transfers over the course of at least two years.  (See, e.g., Mucha Decl. ¶¶ 36, 39.)  The Commission seeks treble damages based solely on the total amount improperly retained by Defendants,[5] i.e., three times $191,689 for a total of $575,067.  This amount is likely less than the amount the Court could, in its discretion, award if it assessed a penalty of $130,000 or $140,000 per violation, given that there were apparently multiple fraudulent withdrawals of pool participant funds.  Based on Defendants' knowing and repeated violations of the Act, the Court finds that a civil monetary penalty in the amount of triple the monetary gain to Defendants is appropriate.

---

[5] In this regard, Siegel transferred approximately $511,598 for personal expenses, when the incentive, management and administrative fees due totaled only $319,909.  The difference of $191,689 is the amount that Defendants misappropriated, and Defendants seek triple this amount.  In the Order for Relief, infra, the Court separates this award in accordance with the respective amounts withdrawn from Monarch and QEP pool funds. Therefore, the civil monetary penalty against Defendants Siegel and TOTE is $315,557.67, which is triple the $105,185.89 misappropriated from Monarch pool participants, and the civil monetary penalty against Defendants Siegel and MJS is $259,510.08, which is triple the $86,503.36 misappropriated from QEP pool participants.

III. <u>ORDER FOR RELIEF</u>

FOR GOOD CAUSE APPEARING, IT IS HEREBY ORDERED, ADJUDGED
AND DECREED AS FOLLOWS:

A.    **Permanent Injunction**

1.    Based on and in connection with the foregoing
conduct, pursuant to Section 6c of the Act, as amended, 7 U.S.C.
§ 13a-1, Defendants are permanently restrained, enjoined and
prohibited from, in or in connection with any order to make, or
the making of, any contract of sale of any commodity in
interstate commerce or for future delivery that is made or to be
made, on or subject to the rules of a designated contract market
for or on behalf of any other person --

(a)   cheating or defrauding or attempting to cheat or
defraud the other person, or

(b)   willfully deceiving or attempting to deceive the
other person by any means whatsoever in regard to
any order or contract or the disposition or
execution of any order or contract, or in regard
to any act of agency performed, with respect to
any order or contract for the other person,

in violation of Section 4b(a)(1)(A) and (C) of the Act, 7 U.S.C.
§ 6b(a)(1)(A) and (C).

2.    Defendants are also permanently restrained,
enjoined and prohibited from, by use of the mails or any means

or any means or instrumentality of interstate commerce, directly
or indirectly --

        (a)   employing any device, scheme or artifice to
            defraud any client or participant or prospective
            client or participant; or

        (b)   engaging in any transaction, practice, or course
            of business which operates as a fraud or deceit
            upon any client or participant or prospective
            client or participant,

in violation of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. §
6o(1)(A) and (B).

      3.   Defendant TOTE is also permanently restrained,
enjoined and prohibited from engaging directly or indirectly in
conduct in violation of Commission Regulation 4.13(c)(2)(i), 17
C.F.R. § 4.13(c)(2)(i).

      4.   Defendants are also permanently restrained,
enjoined and prohibited from directly or indirectly:

        (a)   trading on or subject to the rules of any
            registered entity, as that term is defined in
            Section 1a(40) of the Act, 7 U.S.C. § 1(a)(40);

        (b)   entering into any transactions involving
            commodity futures, options on commodity futures,
            commodity options (as that term is defined in
            Commission Regulation 1.3(hh) and 32.1(b)(1), 17

28

C.F.R. §§ 1.3(hh) and 32.1), security futures
products, swaps (as that term is defined in
Section 1a(47) of the Act, 7 U.S.C. § 1a(47) and
as further defined by Commission Regulation
1.3(xxx), 17 C.F.R. § 1.3(xxx)), and/or foreign
currency (as described in Sections 2(c)(2)(B) and
2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B)
and 2(c)(2)(C)(i) ("forex contracts"), for their
own personal account or for any account in which
they have a direct or indirect interest;

(c)   having any commodity futures, options on
commodity futures, commodity options, security
futures products, swaps and/or forex contracts
traded on their behalf;

(d)   controlling or directing the trading for or on
behalf of any other person or entity, whether by
power of attorney or otherwise, in any account
involving commodity futures, options on commodity
futures, commodity options, security futures
products, swaps and/or forex contracts;

(e)   soliciting, receiving or accepting any funds from
any person for the purpose of purchasing or
selling any commodity futures, options on

commodity futures, commodity options, security

futures products, swaps and/or forex contracts;

(f)   applying for registration or claiming exemption

from registration with the Commission in any

capacity, and engaging in any activity requiring

such registration or exemption from registration

with the Commission except as provided for in

Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9);

and

(g)   acting as a principal (as that term is defined in

Commission Regulation 3.1(a), 17 C.F.R. §

3.1(a)), agent, officer, or employee of any

person (as that term is defined in Section 1a(38)

of the Act, 7 U.S.C. §1a(38)), registered,

exempted from registration or required to be

registered with the Commission, except as

provided for in Regulation 4.14(a)(9), 17 C.F.R.

§ 4.14(a)(9).

**B.   Restitution**

5.   Defendants Siegel and MJS, jointly and severally,

shall pay restitution in the amount of $104,684.47 (hereafter,

the "Restitution Obligation"), plus post-judgment interest.

Post-judgment interest shall accrue beginning on the date of

entry of this Order and shall be determined by using the

Treasury Bill rate prevailing on the date of entry of this Order
pursuant to 28 U.S.C. § 1961.

      6.   To effect payment of the Restitution Obligation
and the distribution of any restitution payments to Messrs.
Coffman and Lund, the Court appoints the National Futures
Association (hereafter, "NFA") as Monitor (hereafter,
"Monitor").  The Monitor shall collect restitution payments from
Defendants and make distribution to Messrs. Coffman and Lund in
accordance with the Findings of Fact, ¶ 21, set forth above.
Because the Monitor is acting as an officer of this Court in
performing these services, the Monitor shall not be liable for
any action or inaction arising from NFA's appointment as
Monitor, other than actions involving fraud.

      7.   Defendants Siegel and MJS shall make Restitution
Obligation payments under this Order to the Monitor in the name
"Siegel/MJS Restitution Fund" and shall send such Restitution
Obligation payments by electronic funds transfer, or by U.S.
postal money order, certified check, bank cashier's check or
bank money order, to the Office of Administration, National
Futures Association, 300 South Riverside Plaza, Suite 1800,
Chicago, Illinois 60606 under cover letter that identifies the
paying Defendant and the name and docket number of this
proceeding.  The paying Defendant shall simultaneously transmit
copies of the cover letter and the form of payment to the Chief

Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

8.   The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Messrs. Coffman and Lund or may defer distribution until such time as the Monitor deems appropriate.  In the event that the amount of Restitution Obligation payments to the Monitor are of a de minimus nature such that the Monitor determines that the administrative cost of making a distribution to eligible pool participants is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth below.

9.   Defendants MJS and Siegel shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

10.  The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Messrs. Coffman and Lund during the

previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

11.  The amounts payable to each restitution recipient shall not limit the ability of any restitution recipient from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state or common law.

12.  Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each restitution recipient is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the Restitution Obligation that has not been paid by Defendants Siegel and MJS, to ensure continued compliance with any provision of this Order, and to hold Defendants in contempt for any violations of any provision of this Order.

13.  To the extent that any funds accrue to the U.S. Treasury for satisfaction of the Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**C.    Disgorgement**

14.   Defendants Siegel and TOTE, jointly and severally, shall disgorge $105,185.89, plus post-judgment interest.  Post-judgment interest shall accrue commencing on the date of the entry of this Order and shall be determined using the Treasury Bill rate prevailing on the date of the entry of this Order pursuant to 28 U.S.C. § 1961.

15.   Defendants Siegel and MJS, jointly and severally, shall disgorge $86,503.36, plus post-judgment interest.  Post-judgment interest shall accrue commencing on the date of the entry of this Order and shall be determined using the Treasury Bill rate prevailing on the date of the entry of this Order pursuant to 28 U.S.C. § 1961.

16.   Defendants shall pay their respective disgorgement obligations to the "Commodity Futures Trading Commission Customer Protection Fund," or, if that is fully funded, to the United States Treasury.  In either case, Defendants shall pay their respective disgorgement obligations by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check or bank money order.  If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

                    Commodity Futures Trading Commission
                    Division of Enforcement
                    ATTN: Accounts Receivables -- AMZ 340
                    E-mail Box: 9-AMC-AMZ-AR-CFTC
                    DOT/FAA/MMAC
                    6500 S. MacArthur Blvd.
                    Oklahoma City, OK 73169
                    Telephone: (405)954-5644

If payment by electronic funds transfer is chosen, Defendants

shall contact Nikki Gibson or her successor at the address above

to receive payment instructions and shall fully comply with

those instructions.  Defendants shall accompany payment of their

applicable disgorgement obligation with a cover letter that

identifies the paying Defendants and the name and docket number

of this proceeding.  Defendants shall simultaneously transmit

copies of the cover letter and the form of payment to the Chief

Financial Officer, Commodity Futures Trading Commission, Three

Lafayette Centre, 1155 21st Street, N.W., Washington, D.C.

20581.

       **D.   Civil Monetary Penalties**

       17.   Defendants Siegel and TOTE shall, jointly and

severally, pay a civil monetary penalty in the amount of

$315,557.67, plus post-judgment interest.  Post-judgment

interest shall accrue on this obligation beginning on the date

of entry of this Order and shall be determined by using the

Treasury Bill rate prevailing on the date of entry of this Order

pursuant to 28 U.S.C. § 1961.

18.   Defendants Siegel and MJS, jointly and severally, shall pay a civil monetary penalty in the amount of $259,510.08, plus post-judgment interest.  Post-judgment interest shall accrue on this obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

19.   Defendants shall pay their respective civil monetary penalties by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables -- AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405)954-5644

If payment by electronic funds transfer is chosen, Defendants shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those instructions.  Defendants shall accompany payment of their applicable civil monetary penalty obligation with a cover letter

36

that identifies the paying Defendants and the name and docket number of this proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

### E.   Provisions Related to Monetary Sanctions

20.   Any acceptance by the Commission or the Monitor of partial payment of Defendants' restitution obligation, disgorgement obligation, or civil monetary penalty obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

21.   Any payments received from Defendants Siegel or MJS pursuant to this Order shall be applied first to satisfy their Restitution Obligation and second to satisfy their disgorgement obligation.

### F.   Miscellaneous Provisions

22.   All notices to the Commission required to be given by any provision in this Order shall be sent via certified mail, return receipt requested, as follows:

37

              Gretchen L. Lowe, Director
              Michael Solinsky, Chief Trial Attorney
              Division of Enforcement
              U.S. Commodity Futures Trading Commission
              1155 21st Street, N.W.
              Washington, D.C. 20581

All such notices to the Commission shall reference the name and docket number of this action.

23.  Until such time as Defendants satisfy in full their restitution, disgorgement and civil monetary penalty obligations, as set forth in this Order, Defendants shall provide written notice to the Commission by certified mail of any change to their telephone number(s) and mailing address(es) within ten (10) calendar days of the change.

24.  This Court shall retain jurisdiction of this action to assure compliance with this Order, the restitution obligation, the civil monetary penalty obligation, and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Order.

25.  The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, upon any person under their authority and control, and upon any person who

receives actual notice of this Order by personal service, e-
mail, facsimile, or otherwise, insofar as he or she is acting in
active concert or participation with Defendants.


                              s/ Noel L. Hillman
                            NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey